# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID AYALA,<br><br>    Plaintiff<br><br>    v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>    Defendant. | Case No. 1:11-cv-1910-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff David Ayala, by his attorney, Lars A. Christenson, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act and for supplemental security income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act").[1] The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[2] Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards. Accordingly, this Court affirms the Commissioner's determination.

---

[1] The DIB and SSI regulations relevant in this case are virtually identical; as such, only the DIB regulations will be cited in the remainder of this opinion. Parallel SSI regulations are found in 20 C.F.R. §§ 416.900-416.999 and correspond with the last digits of the DIB cite (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 5 & 10).

**I.     Procedural History**

Plaintiff claims he has been disabled since April 12, 2007. On June 19, 2007, he applied for DIB and SSI income. AR 90, 98. The agency denied benefits, and on September 28, 2009, ALJ James P. Berry found Plaintiff not disabled. On February 25, 2010, the Appeals Council remanded for an internal medicine examination and further evaluation of Plaintiff's personality order. On April 11, 2011, ALJ Berry conducted the remand hearing. Plaintiff appeared with counsel and testified. Also testifying was Jose L. Chaparro, an impartial vocational expert. In his decision dated May 6, 2011, ALJ Berry again denied Plaintiff's application. The Appeals Council denied review September 30, 2011. Plaintiff filed a complaint seeking this Court's review on November 16, 2011.

**II.    Factual Record**

  **A.    Plaintiff's Testimony**

Plaintiff was born in 1968 and has a high school education. He lives with his twenty-year-old son in a trailer owned by his parents. He claims disability due to hernia, bipolar disorder, depression and personality disorder. On April 12, 2007, his last day of work, he had a mental breakdown. AR 35. Also, in March 2011, a month before the second ALJ hearing, he was held as a suicide risk under California Welfare and Institutions Code § 5150.

Plaintiff testified that he has arthritis, unrepairable hernias, hypertension, and weakness in his hands. He has suicidal thoughts, and has trouble getting along with people and going anywhere. He fluctuates a lot between manic episodes and depression, gets nervous and dizzy, and has a hard time remembering things at times. He can focus for 30 minutes and has low energy due to depression. He can lift ten pounds two or three hours out of eight, stand for two hours, walk two blocks, and sit for four hours. He has bad days four times a week in which he mostly lies down and sleeps. On manic days he has racing thoughts and paces rapidly. He needs to rest twice a day for an hour, and sleeps at least one of the hours. His medication makes him tired, but he is better for a while after resting. He used street drugs and alcohol, but has only drank once or twice in the last three years.

Regarding activities of daily living, Plaintiff tries to keep his house clean and in order, but needs to rest. He can dress himself, but some days he does not shower or dress. He is on probation for committing assault with a deadly weapon in December 2008. He completed his twice-weekly AA

and NA classes and weekly anger management classes in February with no problem. He drives if he needs to. He does no yard work, and cannot push a mower due to weakness in his hands.

### B. Medical Record

#### 1. Psychiatric Consultative Examination by Dr. Barnett (Sept. 2007)

Plaintiff alleges he has been disabled since April 2007. He began seeking mental health treatment in May 2007. On September 7, 2007, Plaintiff saw Michael Barnett, M.D., a board-certified psychiatrist, for a consultative evaluation. AR 338-40. Plaintiff admitted that he has abused alcohol "most of my life." Plaintiff drank a 12-pack of beer a day until he had a DUI in early 2007, then cut back to a six-pack. He also admitted that because of the DUI, he lost his Class A license and lost his truck driver job on April 6, 2007.

Dr. Barnett believed that Plaintiff was probably still abusing alcohol. In general, he did not believe that Plaintiff had mental limitations in performing work-like activities. He gave Plaintiff a current Global Assessment of Functioning ("GAF") rating of 60, reflecting moderate symptoms bordering on mild.[3] He diagnosed alcohol abuse (active and chronic), an unspecified depressive disorder, and personality order. However, until Plaintiff achieved sobriety and went through a substance-abuse treatment program, it would be difficult to make a definitive diagnosis.

#### 2. Psychiatric Treatment—Dr. Saul (Nov. 2007 – April 2008)

On February 14, 2008, Dr. Gilbert Saul performed a psychiatric evaluation. AR 496-500. Plaintiff reported a lifelong history of depression, but no prior psychiatric treatment nor medication until recently. He seemed "unwilling to focus his mind enough to answer basic mental status questions." He answered "in a vague and inconsistent manner" and was "not at all forthcoming." He was finished trying to have his hernia fixed and did not want to look for work. Dr. Saul felt that his poor performance on examinations was "mainly due to lack of motivation." Plaintiff was also an unreliable historian. Plaintiff admitted that he drinks "as much as" a 12-pack of beer each day. He said that "now" he only has an occasional beer. However, Dr. Saul was also aware of Plaintiff's DUI, and that Plaintiff told a social worker that he drinks "three times a week." His alcoholism was

---

[3] The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment, from 1 to 100, of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV").

3

"much worse than he is willing to admit." Plaintiff stated that he had dry heaves in the morning, which Dr. Saul believed could be caused by alcohol abuse. AR 496-500. Dr. Saul diagnosed alcohol dependence, moderate major depressive disorder, and early onset dysthymic disorder. His intelligence was probably average. He gave a current GAF rating of 50, reflecting serious symptoms. He started Plaintiff on an antidepressant. AR 499-500.

By March 19, 2008, Plaintiff responded positively to Prozac. On April 18, 2008, after Plaintiff described suicidal thoughts, Dr. Saul changed Plaintiff's diagnosis to recurrent depressive disorder with psychotic features, increased his Prozac, and added Abilify. AR 483. Four days later, Plaintiff was much calmer and more relaxed. He was more reality-oriented and his thought processes were linear and logical, with at least average intelligence. AR 480.

### 3. Psychiatric Treatment—Dr. Whisenhunt (May 2008 – March 2009)

Arich Whisenhunt, M.D., saw Plaintiff on May 13, 2008. He increased his Prozac and encouraged psychotherapy. He diagnosed depression with psychosis and personality disorder. AR 477-78. After receiving a disability form from an insurance company in connection with Plaintiff's ability to make car payments, Dr. Whisenhunt told Plaintiff he would give him six months of disability, but he expected him to be able to work in the future. AR 470. On October 16, 2008, Dr. Whisenhunt told Plaintiff that he needed to work on getting better rather than feeling sorry for himself, and opined that he was "reluctant to get better, possibly for personal gain." AR 464. On December 11, 2008, Plaintiff was feeling better, helping his son get into college, and taking his medication. AR 453.

On December 31, 2008, Plaintiff was arrested for hitting a man with a bottle at a New Year's Eve party; as he acknowledged to the ALJ, he had "some champagne" that night. AR 81. On February 5, 2009, Dr. Whisenhunt noted that Plaintiff had "been doing fairly well" despite this arrest. AR 441. On March 26, 2009, Dr. Whisenhunt declined to fill out disability forms at Plaintiff's request, advised Plaintiff that "he is able to work," and encouraged him to find a job and problem solve his financial situation. AR 435. Dr. Whisenhunt further opined that "a lot of [Plaintiff's] problems are due to his personality disorder and malingering tendencies." AR 436.

**4.     Letter by Dr. Rice; RFC Questionnaire by Dr. Shubhakar (April 2009)**

Shortly before Plaintiff's first ALJ hearing on April 29, 2009, he submitted two opinions relevant to his RFC. First, in a letter dated April 9, 2009, Dr. Janice Rice wrote that she "personally [has] known Mr. Ayala for many years and [was] aware that his condition only progressively worsens. Not to mention his continuous problems with several hernias which only further hinders his ability to perform even the smallest of jobs, his ongoing mental problems also prevent him from maintaining any type of gainful employment." AR 425.

Second, on April 28, 2009, Plaintiff's physician, Dr. Somwarpet Shubhakar, completed an RFC questionnaire. AR 508-12. In his opinion, Plaintiff had an RFC that was less-than-sedentary. His symptoms would frequently interfere with the attention and concentration needed to complete simple work tasks. He could not do low-stress jobs. He could walk one block without rest, sit and stand for five minutes at a time, and must walk every five minutes for ten minutes at a time; could lift less than ten pounds rarely; and could rarely twist, stoop, crouch, or climb ladders and stairs.

**5.     Psychiatric Treatment—Dr. Saul, Dr. Lopez, Mr. Monclova (April 2009 – May 2010)**

In June 2009, Plaintiff asked to change psychiatrists, explaining that he "did not like Dr. Whisenhunt," who said "that he was faking this." AR 547, 559. In July 2009, Plaintiff began treatment with Carmen Lopez, M.D. He reported that he last drank alcohol and used marijuana in 2007. Dr. Lopez diagnosed recurrent depression and ruled out bipolar disorder. At his request, she switched his prescription from Seroquel to Cymbalta. AR 554-56. In October 2009, Plaintiff said that Seroquel gave him dizziness but he had no side effects from Cymbalta. AR 547.

Plaintiff discontinued treatment with Dr. Lopez and resumed seeing Dr. Saul. At Plaintiff's suggestion, Dr. Saul changed Plaintiff's diagnosis to bipolar disorder and prescribed lithium. AR 541-544. Dr. Saul's notes in January, February, March, and May 2010 indicate that Plaintiff's thinking was reality-oriented, his thought process linear and logical, his judgment and insight fairly good, and his intelligence apparently above average. Plaintiff had some very good days and thought the medication was helping. AR 538, 536, 533, 526. His mood grew worse in April and May 2010, when he was preparing to begin his four-month jail term in late May (for the assault committed in

5

December 2008). AR 527, 530. However, upon release from jail in September 2010, his mood was significantly improved. AR 525.

### 6.  **RFC Questionnaire by Mr. Monclova (Oct. 2010)**

In September 2010, Plaintiff had a twenty-minute phone conversation with Nabori Monclova, who had been his therapist since April 2009. AR 668. Plaintiff was very happy to be out of jail, and was doing well on his medication while in jail. AR 525. He denied mood symptoms. His appetite and sleep were good. The next day, he told Dr. Lopez that his medicines were giving good benefits and no significant side effects. AR 677.

On October 13, 2010, Plaintiff met with Mr. Monclova for the first time since his release from jail. Plaintiff's mood was "good." He took his medications as prescribed and was doing well on them. He was in good spirits and was happy to be out of jail. He was attending anger management and AA classes for probation. He was busy working around the house, doing some gardening, and running errands for his mother. He denied any mood symptoms or changes in sleeping and eating patterns, and was getting along well with his family. AR 675.

Also on October 13, 2010, Mr. Monclova completed a mental assessment and mental impairment questionnaire for Plaintiff's upcoming ALJ hearing on November 2010. AR 561-71. In the assessment, he checked either "moderate" or "marked" limitations for all twenty areas on the form. In the narrative section, he wrote, "see records." In the mental impairment questionnaire, Mr. Monclova listed the side effects of Plaintiff's medications as dizziness and fatigue, and stated that Plaintiff's medication side effects would cause him to have difficulty working at a regular job on a sustained basis. He indicated an "extreme" restriction in maintaining social function; a "moderate" restriction in maintaining concentration, persistence, or pace; and a "mild" restriction in activities of daily living. He assigned Plaintiff a current GAF score of 68, indicating some mild symptoms or generally functioning pretty well. AR 571.

### 7.  **Consultative Examination by Dr. McDonald (Nov. 2010)**

Plaintiff's ALJ hearing of November 4, 2010 was postponed to give Plaintiff more time to attend the consultative exams required in the Appeals Council's remand order. AR 58-59. On November 17, he met with Mr. Monclova. His mood was "okay," his affect euthymic. He was stable

6

on his medications. His behavior had "declined significantly" since his last appointment: he had some stress related to his son and had been verbally aggressive with his ex-wife.

On November 30, 2010, Mary McDonald, Ph.D., conducted the psychological examination ordered by the Appeals Council. AR 600. His speech was clear, well organized, and coherent. He had no signs of delusion or hallucinations. He was very organized in discussing his background, but suddenly forgetful when asked to name the current or past president or the day of the month. He did not discuss any issues until specifically questioned. He denied using alcohol for the last three to four years, but avoided questions about his substance abuse history. He mentioned having been in jail at least ten times, but was evasive about the reasons why. He reported some difficulty getting along with others. He had a history of assaultive behavior that escalated when under the influence of alcohol, but evaded discussing it.

He was minimally cooperative with the intelligence and memory tests. His very low scores were inconsistent with his history of work and seemed inaccurate of his true capabilities. Some elements of his depression appeared related to conflict over having to work. She sensed that he was feigning psychotic symptoms. Dr. McDonald believed he was capable of higher functioning and questioned his motivation. She diagnosed Alcohol Abuse, Probable Alcohol Dependence, Probable Malingering of Psychiatric Symptoms, Adjustment Disorder with Depressed Mood, Borderline Intellectual Functioning or higher, and Antisocial Personality Disorder. She deferred a GAF score due to a lack of truthfulness and cooperation with the evaluation.

Dr. McDonald gave Plaintiff a "low average" ability in the areas of understanding and remembering very short and simple instructions; understanding and remembering detailed instructions; carrying out very short and simple instructions; maintaining attention and concentration for extended periods; accepting instructions from supervisors and respond appropriately to criticism; and in his social judgment and awareness of socially appropriate behavior. He had no limitations in his ability to understand, remember, and carry out instructions. He had mild limitations in his ability to interact appropriately with supervisors, coworkers, and the public, and also in his ability to respond appropriately to usual work situations and to changes in a routine work setting. She mentioned that he was okay until he began drinking, then he became aggressive.

7

**8.     Plaintiff's Hernia; Consultative Examination by Dr. Buttan (Dec. 2010)**

Plaintiff had four surgeries for a recurring hernia, most recently in September 2008. AR 406. On November 12, 2008, the surgeon saw Plaintiff for a follow-up. He observed that Plaintiff had an "excellent recovery" and an "uneventful" postoperative course, and discharged him from his care. AR 406. There is no further evidence of specific treatment of the hernia.

In remanding ALJ Berry's original decision, the Appeals Council ordered an internal medicine examination, noting that the record lacked any objective physical examination and that ALJ Berry had assessed no physical limitations for Plaintiff's hernia. In December 2010, Vinay Buttan, M.D., a specialist in internal medicine, conducted the examination. AR 618.

Plaintiff reported a history of joint pain, a ventral hernia, and a mental condition, and said his hypertension and gastroesophageal reflux disease were controlled with medication. He said he could not sit, stand, or walk for more half an hour to one hour at a time. He complained of comprehension problems and difficulty following commands. The exam showed diffuse tenderness in the epigastric area. Plaintiff had no edema or neurological deficits. He was alert, conscious, and cooperative. His gait was normal, and the range of motion of all joints was normal. His grip strength was 5/5, but he had tenderness in the muscles of his arms and legs. Dr. Buttan diagnosed hypertension, bipolar disorder, gastroesophageal reflux disease, and generalized arthralgias.

In light of Plaintiff's physical and mental conditions, Dr. Buttan found that Plaintiff could occasionally lift and carry up to 20 pounds; sit, stand, and walk for one hour a time; stand and walk for two hours out of eight; sit for four hours out of eight; push and pull occasionally and reach, handle, finger, and feel frequently; operate foot controls with his right foot occasionally; climb, balance, stoop, kneel, crouch, and crawl occasionally; operate a motor vehicle; and work around humidity and pulmonary irritants, and around temperature extremes and vibrations occasionally, but never around unprotected heights and moving mechanical parts. He could not shop, but could perform all other activities of daily living.

**9.     5150 Evaluation (March 2011)**

In December 2010, Plaintiff told Mr. Monclova he was doing better. He denied mood symptoms or suicide ideation. AR 670. In January 2011, he was doing "well for the most part." His

8

medicine appeared to be controlling his symptoms. AR 671. In February 2011, Plaintiff told Dr. Whisenhunt that his medicine really seemed to help since he got out of jail. He had no side effects. He had some low days but no major problems recently. His speech was clear and coherent, his thoughts well organized, and his judgment and insight fair. He had no suicide ideation.

On March 5, 2011, approximately one month before the ALJ hearing, Plaintiff was admitted on a 5150 hold after his sister reported that she saw him with pills and a soda in his hand. AR 652, 687. Plaintiff said he felt suicidal. He said that three months prior, he drove his truck into a pole to kill himself. The admitting physician described Plaintiff as calm and cooperative with no signs of distress, with a GAF of 25. At discharge on March 8, 2011, he had a GAF of 40, alert and oriented cognitive functioning, good concentration, good memory, goal-directed thought process, and fair judgment and insight. AR 652-53, 679-80.

### D. Testimony of Vocational Expert

The vocational expert, Mr. Chaparro, testified that Plaintiff had prior work as a tractor trailer truck driver (medium, 4), heavy truck driver (medium, 4), and stores laborer (heavy as performed, 2).[4] According to Mr. Chaparro, a person with Plaintiff's vocational profile would not be disabled if he had a combination of severe impairments; could lift and carry 50 pounds occasionally and 25 pounds frequently; could stand, walk, and sit for two hours each in an eight-hour workday; could perform simple, repetitive tasks; could maintain attention as well concentration, persistence and pace; could relate well and interact with others; could adapt to usual changes in work settings; and could adhere to safety rules. Such a person could perform Plaintiff's past work as stores laborer, only at strength rating of "medium." In addition, he could perform representative occupations such as bagger (medium, unskilled—23,000 jobs in California, 165,000 nationally), automobile detailer (medium, unskilled—10,000 in California, 71,700 nationally), or hospital cleaner (medium, unskilled—8,000 in California, 75,000 nationally).

---

[4] Each job title is followed by a strength rating and a Specific Vocational Preparation number in parentheses. The strength rating captures the physical demands and frequency of certain basic activities. The frequency may be "never," "occasional" (up to one-third of the workday), "frequent" (from one-third to two-thirds), or "constant" (two-thirds or more). The Specific Vocational Preparation ranks, from one to nine, the time required to learn facility in the job. *See* Dictionary of Occupational Titles (4th ed.1991) Appendix C.

Mr. Chaparro also considered other hypotheticals. These were not material to the ALJ's decision, as the ALJ found that Plaintiff's RFC met or exceeded the first hypothetical.

### III. The ALJ's Decision

The ALJ found that Plaintiff had not met his burden under the Act to show that he was disabled. Pursuant to 42 U.S.C. § 1382c(a)(3)(A), to be disabled, a claimant must be unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. In explaining his decision, the ALJ followed the five-step sequential analysis as required under 20 C.F.R. §§ 404.1520 (a)-(f):

Step one:   Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two:   Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four:  Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

At Step One, ALJ Berry found that Plaintiff had not engaged in substantial gainful activity since April 12, 2007, the alleged onset date of the disability. At Step Two, Plaintiff had three severe medically determinable impairments: hernia, bipolar disorder or depression, and personality disorder. Two other impairments—a transient ischemic attack and arthritis—were not severe. AR 13.

At Step Three, Plaintiff's mental impairments, considered singly or in combination, did not meet or equal the listings for affective disorders (12.04) or for personality disorders (12.08). Both listings require at least two of the following four "paragraph B" criteria: marked restriction of

10

activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. Because his impairments satisfied none of these criteria—and because he also did not satisfy the "Paragraph C" criterion for affective disorders—he was not disabled at Step Three.

At Step Four, the ALJ found that Plaintiff was not disabled. He could lift and carry 50 pounds occasionally and 25 pounds frequently, and stand, walk, or sit for six hours in an eight-hour workday. Mentally, he could perform simple, repetitive tasks; maintain attention, concentration, persistence, and pace; relate to and interact with others; and adapt to usual changes in work setting and adhere to safety rules. As this RFC met or exceeded Mr. Chaparro's first hypothetical, Plaintiff could perform his past work as a stores laborer (medium, 2).

## IV. Discussion

### A. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. This Court must uphold the decision if the ALJ applied the proper legal standards and made findings supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the Court may not substitute its judgment for that of the Secretary. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.1996).

### B. The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff claims that the ALJ did not state adequate reasons to find his symptoms not credible. When considering symptom evidence, the ALJ must first determine whether the record establishes an impairment that could reasonably give rise to the reported symptoms. *See* SSR 96-7p; 20 C.F.R.

11

§§ 404.1529; *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). Here, the ALJ found that Plaintiff's symptoms could be produced by his hernia, bipolar disorder or depression, and personality disorder. He was therefore required to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit functioning. To find a claimant not credible, the ALJ must either make a finding of malingering based on affirmative evidence, or must make specific findings as to credibility supported by clear and convincing reasons. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006); *see also Schow v. Astrue*, 272 F. App'x 647, 654 (9th Cir. 2008).

The ALJ properly concluded Plaintiff was not fully credible, for two independent reasons. First, the ALJ made a finding of malingering based on affirmative evidence. At the ALJ hearing in April 2011, Plaintiff testified he left his job as a truck driver because he could not take it any more mentally; however, in September 2007, three months after he lost his job, he told Dr. Barnett that could no longer work because he was convicted of a DUI and lost his Class A driver's license. *See, e.g., Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (affirmative evidence of malingering included the discrepancy between claimant's allegations of disability dating from his last day of work and his admission that he left his job because his employer went out of business). Dr. McDonald believed that Plaintiff was feigning low intelligence and psychotic symptoms, and Dr. Whisenhunt noted Plaintiff's "malingering tendencies" and spurned Plaintiff's request to be found disabled. The ALJ also did not credit Plaintiff's 5150 commitment in March 2011. This occurred at the tail end of a series of positive mental health sessions, and one month prior to Plaintiff's next ALJ hearing, suggesting that it was contrived. Plaintiff claimed to have driven his truck into a pole to kill himself, but there is no evidence in the record of this event, including in progress notes from his therapy for the preceding months.

Aside from this finding of malingering, the ALJ also had clear and convincing reasons for doubting Plaintiff's credibility. Here, Plaintiff's testimony conflicted with the record as a whole. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) ("In determining credibility, an ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony."). Although Plaintiff complained of fatigue

from his hernias, his past surgery revealed excellent recovery. *See Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009) ("ALJ made specific findings in support of his decision to discount [the claimant's] testimony," including that her "statements at her hearing do not comport with objective evidence in her medical record"). Similarly, Dr. Saul attributed some of Plaintiff's symptoms to his alcohol abuse. Plaintiff claimed he had not used alcohol more than once or twice in the last three years, but he was arrested for a fight that occurred while he was drinking in February 2009. His depression seemed to be situational and not chronic; it grew worse when he was preparing to go to jail, and improved when he got out. The inconsistencies surrounding Plaintiff's 5150 commitment also cast doubt on his credibility. *See Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (inconsistent statements are one factor that can be used in determining a plaintiff's credibility). Plaintiff believes that he must be found credible simply because he sought treatment. While Plaintiff's longitudinal record seeking treatment lends some support to his symptoms, the treatment itself is of little value when Plaintiff is "reluctant to get better, possibly for personal gain," as opined by treating psychiatrist Dr. Whisenhunt. The remainder of Plaintiff's challenge to the ALJ's credibility finding is based on opinions that, as discussed below, the ALJ properly discounted. *See, e.g., Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (in determining RFC, the "ALJ was not required to incorporate evidence from the opinions of [the claimant's] treating physicians, which were permissibly discounted").

### C. The ALJ Properly Assessed the Opinion Evidence

Plaintiff also claims that the ALJ did not state adequate reasons for rejecting the opinions of Dr. Shubhakar, Dr. Buttan, and Mr. Monclova. "The ALJ must set out in the record his reasoning and the evidentiary support for his interpretation of the medical evidence." *Lester*, 81 F.3d at 832. An ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). He must set forth his own interpretations and explain why they, rather than those of the doctors, are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

13

### 1. **Dr. Shubhakar**

Dr. Shubhakar opined that Plaintiff had a less-than-sedentary RFC due to his physical and mental impairments. Dr. Shubhakar was a treating physician whose opinions were contradicted by those of another treating physician (Dr. Whisenhunt, a specialist in mental health). To reject the opinion of an treating or examining doctor in favor of that of another treating or examining doctor, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence in the record. *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007). The weight that the ALJ gives to a medical source is based in part on the nature of the source's treatment relationship with the claimant and on whether he has examined the claimant. 20 C.F.R. § 404.1527. Other factors to consider are the opinion's supportability (i.e. explanatory power in terms of evidence, particularly medical signs and symptoms); its consistency with the record as a whole; and whether the medical source is a specialist in the area of his opinion. 20 C.F.R. § 404.1527.

Here, the ALJ provided "specific and legitimate reasons" supported by substantial evidence in the record for rejecting Dr. Shubhakar's opinion. The ALJ referred to the opinion of Dr. Whisenhunt, who opined that Plaintiff was "reluctant to get better, possibly for personal gain," and believed that "a lot of [Plaintiff's] problems are due to his personality disorder and malingering tendencies." Dr. Whisenhunt specifically declined to complete a disability form at Plaintiff's request, feeling that Plaintiff could work and was not trying to find it. The ALJ found that Plaintiff's malingering cast doubt on Dr. Shubhakar's assessment. *See Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir.1999) ("A physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted'") (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir.1989)). The ALJ also observed that Plaintiff's latest hernia repair had apparently been successful. Also, Plaintiff's daily activities contradicted Dr. Shubhakar's characterization of his limits. Plaintiff refers to the letter from Dr. Rice as support for Dr. Shubhakar's opinion. However, the ALJ found her opinion unreliable. There was no evidence that Dr. Rice was a medical doctor or had medical knowledge of Plaintiff's conditions. Just as the ALJ was justified in giving little weight to her opinion, he was justified in giving it little weight as support for Dr. Shubhakar's opinion.

### 2. **Dr. Buttan**

Dr. Buttan did a consultative examination of Plaintiff. The ALJ rejected this opinion. Because Dr. Buttan was an "accepted medical source" in an examining role, the ALJ had the same burden in rejecting this opinion as he had in rejecting Dr. Shubhakar's opinion: in order to favor the opinion of another examining doctor, he had to provide "specific and legitimate reasons" supported by substantial evidence in the record.

The ALJ met this burden. He found that Dr. Buttan's opinion was based on Plaintiff's subjective complaints and inconsistent with the opinions of Dr. McDonald and Dr. Whisenhunt, as well as with Dr. Buttan's own findings on examination. Dr. Buttan assessed limitations based on Plaintiff's subjective complaints of leg pain, but these complaints were inconsistent with his full range of motion of all joints and no prior history of muscle tenderness. Dr. Buttan also diagnosed arthralgias without any basis in the medical record. In stating how long Plaintiff can sit, stand, or walk, Dr. Buttan used the number that Plaintiff provided during the consultation, which implicates Plaintiff's own problematic credibility.

Dr. Buttan also attributed several of Plaintiff's limitations to his mental condition. The ALJ gave less weight to Dr. Buttan's findings on this basis, noting that Dr. Buttan is not a mental health specialist. Plaintiff challenges this consideration, but the regulations make clear that the opinion of doctor who specializes in the relevant field is entitled to greater weight. 20 C.F.R. § 404.1527(d)(5); *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). Given the wealth of opinions from mental health specialists in the record, the ALJ was entitled to discount Dr. Buttan's non-specialist opinion as to how Plaintiff's mental impairment affected his functioning.

### 3. **Mr. Monclova**

Mr. Monclova opined that Plaintiff had many mental limitations. The ALJ rejected this opinion. As a marriage and family therapist, Mr. Monclova was a treating medical source, but only an "other source" and not an "acceptable medical source" as defined in the regulations. SSR 06-3p; 20 C.F.R. § 404.1527(c). In rejecting an "other source" such as Mr. Monclova, the ALJ generally need only explain the weight that he gave to the source's opinion. SSR 06-3p. The fact that a medical opinion is not from an "acceptable medical source" is a factor that may justify giving that

15

opinion lesser weight than an opinion from an "acceptable medical source." *Id.* However, depending on the facts, such an opinion may outweigh the opinion of even a treating source. *Id.*

The ALJ explained that he gave little weight to Mr. Monclova's opinion because it was inconsistent with treatment records. Indeed Mr. Monclova's opinion was inconsistent with the progress note that he recorded very day that he wrote his opinion. Due to Plaintiff's time in jail, Mr. Monclova had not seen Plaintiff in four months. In his opinion, Mr. Monclova opined that Plaintiff had an "extreme" limitation in social functioning. But the progress note indicated that Plaintiff had been going to classes, working around the house, and helping his mother. Plaintiff described his mood as "good," and his affect was good. He was in good spirits, with no change in mood symptoms, and he was getting along well with his family. Similarly, the opinion stated that Plaintiff's medication side effects would cause him difficulty working at a regular job. But previous records show that the dizziness that Plaintiff experienced from Seroquel went away when he switched to Cymbalta in July 2009, and Mr. Monclova's progress note stated that Plaintiff was doing well on his medications. Mr. Monclova's opinion was also internally inconsistent: Plaintiff was "markedly" limited in his ability to carry out short and simple instructions, but only "moderately" limited in his ability to carry out detailed instructions. Also, Plaintiff's current GAF score was 68. This is in a range that indicates "some mild symptoms … but generally functioning pretty well," DSM-IV at 34, and is inconsistent with the many "marked" limitations and one "extreme" limitation that Mr. Monclova identified.

**V.     Conclusion**

The ALJ's conclusions were supported by substantial credible evidence. Accordingly, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits. The Clerk of Court is directed to enter judgment for Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 19, 2013**             **/s/ Sandra M. Snyder**
                                                                UNITED STATES MAGISTRATE JUDGE